IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

MIRSONIA OSORIO VELAZQUEZ, et al.,

Plaintiff,

v.

MUNICIPAL GOVERNMENT OF CATANO, et al.,

Defendants.

CIVIL NO. 13-1418 (CVR)

## OPINION AND ORDER

### INTRODUCTION

Once again, the Court is faced with another tally in the ever prevalent record of the Puerto Rican federal court system, where cases swamp the federal docket every four (4) years following gubernatorial elections held in Puerto Rico when the incumbent party is defeated. Plaintiffs herein are four (4) former employees of the Municipality of Cataño, to wit, Julio Ortega Cruz ("Ortega"), Mabel Osorio Castro ("Osorio-Castro"), Carmen Rivera Cancel ("Rivera") and Marilyn Guzmán Ortíz ("Guzmán"). Three (3) others are former Municipality contractors, to wit, lawyer Mirsonia Osorio Velázquez ("Osorio-Velázquez"), and two (2) photographers, Francisco Castrodad Vicente ("Castrodad"), and Rafael Rosado Fontánez ("Rosado"). They claim a multitude of violations to their rights, which at this stage have been reduced to violations to the First Amendment and to the due process clause of the Fourteenth Amendment, as well as a sprinkling of state law violations.[1]

Defendants are the following: (1) the Municipality of Cataño; (2) the Municipal Legislature of Cataño ("MLC"); (3) Cataño's elected Mayor, José Rosario-Meléndez

---

[1] See Docket Nos. 20 and 32.

("Rosario"), and (4) the Cataño Municipal Legislature President, David García Otero

("García").  These last two (2) were sued in both their personal and official capacities.

In November of 2012, mayoral candidate Defendant Rosario of the Popular

Democratic Party ("PDP") won the Cataño municipal election over the incumbent  New

Progressive Party ("NPP") candidate.  Defendant García ran for the Cataño  Municipal

Legislature and also won, occupying the position of its President.  Plaintiffs, who are NPP

members,  claim a myriad of violations to their rights by these Defendants, members of the

PDP.

Plaintiffs Osorio-Velázquez, Castrodad and Rosado (hereinafter, collectively, the

"contract Plaintiffs") were employees who had previously performed services under

contract, and allege the Municipality refused to pay them for services rendered before

Defendants took office.  Plaintiffs Guzmán, Ortega and Rivera (hereinafter, collectively, the

"Career/trust Plaintiffs") claim they were trust employees performing career (or non-policy

making functions, thus making them career employees) who were dismissed from their

positions without due process of law.   Finally, Plaintiff Osorio-Castro is a transitory

employee who claims to be a career employee, and that Defendants refused to renew her

contract, despite her clear expectation of renewal.  Plaintiffs allege all these actions were

undertaken by Defendants on the basis of their political affiliation to the NPP.  On May 31,

2013, they brought suit against all the aforementioned Defendants.

Before the Court now are a several dispositive motions by all Defendants which

include: "Motion for Summary Judgment" by the MLC and co-Defendant García, in his

official capacity (Docket No. 54); "Motion for Summary Judgment" by the Municipality of

Cataño and co-Defendant Rosario, in his official capacity (Docket No. 55); and "Motion for Summary Judgment" by co-Defendants Rosario and García in their individual capacities (Docket No. 56); Plaintiffs' opposition thereto (Docket No. 68), and Defendants' Reply to Plaintiffs' opposition  (Docket No. 83).

Defendants urge dismissal of all claims brought against them on several grounds. Regarding the contract Plaintiffs, Defendants posit they have not presented a *prima facie* case of political discrimination; that the individual co-Defendants were not personally involved in the actions alleged; and that, even if a *prima facie* case has been made, the Municipality's lack of payment stems from a legitimate, non-discriminatory reason, that being, lack of funds.

Regarding the four (4) career/trust Plaintiffs, Defendants aver they have not presented a *prima facie* claim of political discrimination because they occupied trust positions to which they held no proprietary interest and could, thus, be freely removed from them without cause; and that the individual Defendants are entitled to qualified immunity.

Regarding Plaintiff Osorio-Castro, Defendants aver she also, has not presented a *prima facie* claim for political discrimination because she occupied a transitory position, and could also be freely removed; she was hired temporarily for another position; and the position she was removed from has not been filled, also due to economic reasons.

Plaintiffs of course, disagree, and argue that: 1) regarding the First Amendment claims, not only have they demonstrated a *prima facie* claim, but Defendants' Mt. Healthy defense of lack of funds cannot prevail, as there is insufficient evidence in the record to surpass the summary judgment hurdle; and 2) regarding the due process claims, they argue

that genuine issues of fact remain regarding Plaintiffs' functions and whether they were, in fact, trust employees as Defendants have stated. Finally, Plaintiffs challenge the individual Defendant's qualified immunity defense.

For the reasons explained herein below, the three (3) Defendants' Motion for Summary Judgment are hereby DENIED.

## STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56 (c). Pursuant to the language of the rule, the moving party bears the two-fold burden of showing that there is "no genuine issue as to any material facts," and that he is "entitled to judgment as a matter of law." Vega-Rodríguez v. Puerto Rico Tel. Co., 110 F.3d 174, 178 (1st Cir. 1997).

After the moving party has satisfied this burden, the onus shifts to the resisting party to show that there still exists "a trial worthy issue as to some material fact." Cortés-Irizarry v. Corporación Insular, 111 F.3d 184, 187 (1st Cir. 1997). A fact is deemed "material" if it potentially could affect the outcome of the suit. Id. Moreover, there will only be a "genuine" or "trial worthy" issue as to such a "material fact," "if a reasonable fact-finder, examining the evidence and drawing all reasonable inferences helpful to the party resisting summary judgment, could resolve the dispute in that party's favor." Id.

At all times during the consideration of a motion for summary judgment, the Court must examine the entire record "in the light most flattering to the non-movant and indulge

all reasonable inferences in the party's favor." <u>Maldonado-Denis v. Castillo-Rodríguez</u>, 23 F.3d 576, 581 (1st Cir. 1994).  There is "no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, [and] no room for the judge to superimpose his own ideas of probability and likelihood . . . ." <u>Greenburg v. Puerto Rico Mar. Shipping Auth.</u>, 835 F.2d 932, 936 (1st Cir. 1987).  In fact, "[o]nly if the record, viewed in [this] manner and without regard to credibility determinations, reveals no genuine issue as to any material fact may the court enter summary judgment." <u>Cadle Co. v. Hayes</u>, 116 F.3d 957, 960 (1st Cir. 1997).

The First Circuit Court of Appeals has "emphasized the importance of local rules similar to Local Rule 56 [of the District of Puerto Rico]." <u>Hernández v. Philip Morris USA, Inc.</u>, 486 F.3d 1, 7 (1st Cir. 2007); <u>see</u> also <u>Colón v. Infotech Aerospace Services, Inc.</u>, 869 F.Supp.2d 220, 225-226 (D. Puerto Rico 2012).  Rules such as Local Rule 56 "are designed to function as a means of 'focusing a district court's attention on what is—and what is not—genuinely controverted.' " <u>Hernández</u>, 869 F.Supp.2d at 7 (*quoting* <u>Calvi v. Knox County</u>, 470 F.3d 422, 427 (1st Cir. 2006)).  Local Rule 56 imposes guidelines for both the movant and the party opposing summary judgment.  A party moving for summary judgment must submit factual assertions in "a separate, short, and concise statement of material facts, set forth in numbered paragraphs." Loc. Rule 56(b). A party opposing a motion for summary judgment must "admit, deny, or qualify the facts supporting the motion for summary judgment by reference to each numbered paragraph of the moving party's statement of facts." Loc. Rule 56 (c).  If they so wish, they may submit a separate statement of facts which they believe are in controversy.  Facts which are properly

supported "shall be deemed admitted unless properly controverted."  Loc. Rule 56(e); P.R. Am. Ins. Co. v. Rivera-Vázquez, 603 F.3d 125, 130 (1st Cir. 2010) and Colón, 869 F.Supp.2d at 226.  Due to the importance of this function to the summary judgment process, "litigants ignore [those rules] at their peril."  Hernández, 486 F.3d at 7.

## FINDINGS OF FACT

In light of the documentary evidence presented, and based on the parties' submissions, the Court deems the following facts to be uncontested:[2]

1.     No change in functions or in the structural organization has affected the positions of Plaintiffs occupying positions in the Municipal Legislature.  D. Exhibit 11.

2.     Julio Ortega occupied the position of Sergeant at Arms at the MLC.  D. Exhibit 3.

3.     The Sergeant at Arms position entails several functions, two of which are maintaining order during municipal legislative assemblies as well as circulating the notifications of the meetings to be held at the Cataño Municipal Assembly.  D. Exhibit 1, p. 1, ¶¶ 1 and 4; D. Exhibit 2, p. 17; lines 6-11.

4.     The Sergeant at Arms works under the direct supervision of the Secretary of the MLC and executes the orders of the President of the MLC.  D. Exhibit 1 p. 1, ¶¶ 2 and 7.

---

[2]   Any facts not properly controverted were deemed admitted pursuant to the Local Rules, if evidence sustaining them was found in the record.   In the event the parties submitted duplicitous facts, only one fact was deemed admitted.  Finally, Defendants' facts were noted as "D. Exhibit", and a number, while Plaintiffs' facts were noted as "P. Exhibit" with a letter.

5.    The Sergeant at Arms, among others, must have knowledge as to the norms and protocols that operate in the MLC, which include knowledge of the norms and procedures in maintaining security and order.  D. Exhibit 1, p. 2, ¶ 12 and 14.

6.    Plaintiff Ortega agreed he had to have the trust of the President of the MLC in order to obtain the position of Sergeant at Arms.  D. Exhibit 2, pp. 52, lines 17-25; p. 53, lines 31-17.

7.    On August 9, 2001, Ortega signed the notification sheet confirming his Sergeant at Arms position. This sheet shows, in box number 13, that he acknowledged occupying a trust position ("servicio de confianza"). D. Exhibit 3, box 13.

8.    As part of his work, Ortega was not privy to documents and issues related to political issues dealt with in the MLC.  He was not present during the caucus meetings of the legislators.  P. Exhibit B, page 17, lines 18-25; page 18, 1-21.

9.    Co-Plaintiff Marilyn Guzmán first occupied the position of Accounting Clerk for the MLC in 1991. Exhibit 4, p. 21; lines 11-18.

10.   Details regarding the position of Accounting Clerk are contained in the job description. A review of the job description shows the position responded to the Secretary of the MLC and contained several examples of the type of work performed which included, among them, to provide "auxiliary accounting tasks," "under the supervision of the Secretary [of the MLC]", keeping the accounting books and balancing the available funds.  In addition, the job

description details how the Accounting Clerk was given some autonomy and personal criteria in the execution of her functions.  D. Exhibit 5, p. 1, ¶¶ 1-2, 4-5 and  2-8.

11. Although there is a change report dated August 1991 changing the Accounting Clerk position from transitory to trust position, Guzmán does not recall being notified of this change.  D. Exhibit 4, p. 69, l. 2-8, 17-18.

12. Guzmán's responsibilities included keeping the accounting books under the direct supervision of the Secretary of the MLC, who taught her how to execute this task.  D. Exhibit 4, p. 24; lines 12-15; P. Exhibit C, p. 72, L. 1-5

13. In addition to the book keeping, Guzmán was in charge of making sure that all of the funds that were available were balanced. D. Exhibit 4, p. 31; lines 2-6.

14. Guzmán was in charge of the finances of the whole MLC, through the instructions she received from the Secretary or the President.  D. Exhibit 4, p. 31, l. 16-24.

15. Guzmán admits the MLC stores and administers the contracts of the several providers to the MLC, which is different from what happens with the contracts provided for the executive branch of the Municipality.  D. Exhibit 4, pp. 23-24; lines 25 and 1-5.

16. Guzmán acknowledges the President of the Legislature requests the budget that he needs.  D. Exhibit 4, p. 25; lines 15-20.

17.     Guzmán   received direct instructions from either the Secretary of the Municipal Legislature or the President of the Municipal Legislature as to how to undertake the financial transactions related to such budget.  D. Exhibit 4, p. 26; lines 2-16.

18.     Guzmán recognizes the Secretary of the Municipal Legislature is a trust employee of the President of the Municipal Legislature. D. Exhibit 4, p. 26; lines 17-19.

19.     Guzmán recognizes that each President of the Municipal Legislature has a different policy as to how he or she wishes to spend the money allotted to the Municipal Legislature.  D. Exhibit 4, p. 26; lines 20-24.

20.     Guzmán acknowledges that the President of the Municipal Legislature is selected or elected by the members of the body and that he is always of the same political party of the majority of the municipal legislators who won seats in the prior election. D. Exhibit 4, pp. 26-27; lines 25 and 1-18.

21.     Guzmán acknowledges that every single president with whom she has served at the MLC (up to January 2013) was affiliated to the NPP.  D. Exhibit 4, p. 27; lines 9-12.

22.     Guzmán admits that the NPP legislature only selected NPP members for vacant positions. D. Exhibit 4, p. 39; lines 11-24.

23.     Guzmán did not know of co-Defendant García's policy plan for the use of funds as the elected representative.  D. Exhibit 4, p. 44; lines 12-16.

24.   Plaintiff Carmen Rivera occupied the "Confidential Office Systems Assistant" position and has held that position since she was appointed in 1997.  D. Exhibit 7, p. 9 and 11; lines 18-21 and 7-9.

25.   Rivera was interviewed by the president of the Municipal Legislature at the time, Ms. Ena Pagán. D. Exhibit 7, p. 11; 19-25.

26.   The details regarding Rivera's position as Confidential Office Systems Assistant are contained in her job description.  The position required her to perform general secretarial work, particularly drafting documents, "under the direct supervision of the Secretary of the [MLC]." P. Exhibit A, at 1 (¶¶ 1-2).

27.   Rivera was aware that she occupied a trust position.  Every appointment she has received at the Municipality has been a trust appointment, even though she was not aware of this fact when she began working at the Municipality. D. Exhibit 7,  p. 12; lines 8-25, p. 13; lines 1-4; p. 16; lines 6-20.

28.   Rivera knows that trust positions are generally of free appointment and removal, but she did not know that when she started working. D. Exhibit 7, pp. 13-14; lines 15-24.

29.   Rivera admits she was able to remain working at the Legislature during Mayor Rosario's first term because the Legislature was under an NPP majority, and that if that changed, the composition of the employees of the legislature would change.  During the last term, there was no one from the Mayor's party working at the Legislature.  D. Exhibit 7, p. 25; lines 9-22.

30.     Rivera left her job with the Municipality in 2005 for health reasons and returned in 2006.  She was reinstated to the same position upon her return after being interviewed by the President of the Legislature at the time, Juan Martínez.  D. Exhibit 7, p. 14; lines 11-25.

31.     She returned to her job in 2006 without having to compete with anyone else for the position.  D. Exhibit 7, p. 16; lines 2-5.

32.     Even though two other people had the same job title as Rivera, they did not perform the same functions.  D. Exhibit 7, pp. 17-18; lines 12-24 and 2-10.

33.     Rivera received her work instructions from the Secretary of the MLC.  P. Exhibit F, page 17, lines 12-15.  She did not keep or have access to the agenda of the President of the Municipal Legislature. P. Exhibit F, page 22, lines 3-14.

34.     Rivera had access to confidential information and letters within the MLC.  D. Exhibit 7, p. 20; lines 3-20.  She prepared letters for the signature of the NPP affiliated Secretary and President of the Municipal Legislature, and could have done so for any legislator.  D. Exhibit 7, pp. 21-22; lines 5-25 and 1-2.

35.     Rivera never spoke to Mayor José Rosario Meléndez; she only greeted him, and political topics were never discussed, but she was present at a meeting when co-Defendant García told her and others that the Mayor did not want NPP members in the Legislative Assembly.  P. Exhibit F, pp.33-34, l. 22-25, 1-11; D. Exhibit 7, pp. 37-38; lines 15-25 and 1-2.

36.    Co-Plaintiff Osorio-Castro worked as a Social Worker for eight years for the Municipality of Cataño, until December 31, 2012. D. Exhibit 8, p. 7; lines 19-24; P. Exhibit H, p. 15, l. 9-11.

37.    The details regarding Osorio-Castro's position as Social Worker are contained in the job description, which indicates it is a career position.  P. Exhibit G at 3 (¶ 6); P. Exhibit H, page 14, lines 11-24.  As per her job description, Osorio-Castro provided direct professional social services to people who needed them.  P. Exhibit G, at 1 (¶ 1).

38.    Osorio-Castro admits she was a transitory or contract employee throughout her tenure as a social worker at the Municipality of Cataño. D. Exhibit 8, p. 12; lines 2-5.  However, her job description identified the position as a career position, with a probationary period of six (6) months.   D. Exhibit 9.

39.    Osorio-Castro admits that, if her contract was not renewed, she would cease being a municipal employee. D. Exhibit 8, p. 15; lines 1-14.

40.    Osorio-Castro never applied for any permanent or career position at the Municipality of Cataño, whether as a social worker or any other job.  None was available. D. Exhibit 8,  pp. 15-16; lines 18-25 and 1-2.

41.    Osorio-Castro was named interim Director of the Senior Citizen's Center of the Municipality of Cataño by former Mayor Soto. D. Exhibit 8, p. 18; lines 11-15.

42.    Co-defendant Mayor Rosario kept her as the acting director of the Senior Citizen's Center at the Municipality of Cataño for approximately a year and

a half after he was elected Mayor, in spite of knowing she was NPP. She was eventually substituted for Mayra Meléndez, a PDP supporter. D. Exhibit 8, pp. 17-18; lines 12-25 and 14-17; P. Exhibit D, p. 30, l. 19-25; P. 31, l. 1-7.

43.    The social worker position formerly occupied by Osorio-Castro has remained vacant ever since her contract was not renewed. The reason offered by the Municipality for this is due to the "economic condition of the Municipality". D. Exhibit 10.

44.    No recruitment or selection procedures have ever been conducted for Osorio-Castro. D. Exhibit 10.

45.    The Municipality of Cataño has been traversing through severe financial distress since the year 2009 and has suffered from significant "cash-flow" problems stemming from the failure to adequately meet budgeted revenue targets as well as cost targets, given the serious economic situation that the Municipality of Cataño and the Commonwealth of Puerto Rico are currently undergoing. D. Exhibit 12, p. 1, ¶ 3.

46.    The economic and budget problems at the Municipality of Cataño have been so severe that higher portions of the current budget are appropriated to settle past debts. D. Exhibit 12, p. 1, ¶ 4.

47.    For example, a past debt of three million dollars ($3,000,000.00) with the Puerto Rico Department of Treasury is currently being financed with resources of the present budget. The budget allocation for this debt was made only recently. D. Exhibit 12, p. 1, ¶ 4.

48.  Guzmán was aware of the financial conditions of the Municipality since 2009. D. Exhibit 4, pp. 88-90; lines 10-25, 1-25, and 1-15.

49.  In November, 2014, Finance Director Hector Santos Pagán issued a sample listing of 35 persons/or companies that the Municipality owed monies to.  D. Exhibit 17.

50.  The Department of Finance of the Municipality of Cataño pays the salaries of the employees and the fees of the professional service contractors of both the Municipality of Cataño and the MLC. D. Exhibit 12, p. 1, ¶ 5.

51.  The payment of employees belonging to the MLC runs against the budget of the Municipal Legislature itself. In other words, current employees and professional service contractors of the MLC are paid from this budget. Exhibit 12, p. 2, ¶ 6.

52.  With particular regards to professional service contractors serving under the MLC, payment for their services must comply with several steps before final disbursement of payment, which are:

   a. First, a certification of funds is made with the intended budget for the contracted position at the beginning of the fiscal year (which runs from July until June of the following year).  This indicates that a monetary assignment has been made against said budget.  This does not mean that the funds are entirely available, only that the budget accounts for the contractor's fees or payments;

b. Second, the President of the MLC must certify that the work charged by the contractor has been performed.  This implies that the President of the Legislature must sign the billing sheet of the contractor;

c. Third, once the billing sheet is signed, the same is passed on to the Department of Finance for disbursement.  However, disbursement of payment will depend on several factors, such as the ability of the contractor to timely submit his or her billing sheets.  Another example is the availability of resources to pay such debts.

D. Exhibit 12, p. 2, ¶ 7; D. Exhibit 14, pp. 1-2, ¶ 8.

53.     The budgeted revenue and costs are not the same as actual revenues and costs; actual revenues may come in less than budgeted and actual costs may increase from the budget. The uncertainty of any municipality's budget – especially one such as the Municipality of Cataño – is that revenues are dependent upon a monthly income-stream that arises from different sources of proceeds, such as CRIM taxes (property taxes), construction taxes (which depends upon construction activity), municipal patents, sales taxes, and others. These income-streams fluctuate month-to-month and vary greatly throughout the year. As a result, the cash-flow of a municipality can be strained at different time periods, especially if economic conditions lag projections. D. Exhibit 12, p. 2, ¶ 7.2.

54.    Plaintiff Osorio-Velázquez is a lawyer admitted to practice in Puerto Rico since 1984.  P. Exhibit E, page 8, lines 18-22.

55.    Osorio-Velázquez was first given a professional services contract at the MLC on July 1, 2000.  P. Exhibit E, page 9, lines 18-22.  She had previously advised them on a pro bono basis.  Id., page 10, lines 7-17.

56.    Osorio-Velázquez is an ex-contractor collecting money from the Department of Finance.  She admits that co-Defendant García was never head of the MLC when she rendered services to the Municipality, and she did not provide services to the present MLC under García.  D. Exhibit 15, p. 35; lines 3-13.

57.    Osorio-Velázquez  does not know if the Mayor authorizes every check the Municipality issues.  D. Exhibit 15, p. 19,  l. 20-25; p. 20, l. 1.

58.    Osorio-Velázquez did not write to the former president of the MLC, Ramón Roig, to complain about the non-payment of her services because he called the Finance Director in front of her to inquire about the matter.  D. Exhibit 15, p. 47; lines 2-17.

59.    Osorio-Velázquez submitted letters complaining about her non-payment to the Director of the Finance Department, Héctor Santos-Pagán, but she did not furnish them to the Defendants.  D. Exhibit 15, pp. 47-48; lines 23-25 and 1-13.

60.    Plaintiff Rosado is a professional photographer who studied at the Academy of Photographic Arts in Hato Rey, from 1978 to 1979, and was worked as a photographer since then. P. Exhibit I, page 7, lines 2-20.

61.     Rosado worked as a professional services contractor for the MLC from 2011 to 2012. P. Exhibit I, page 9, lines 7-12.

62.     Rosado admits that co-Defendant García does not draft any checks for employees or for professional service contractors of the MLC and acknowledges that this function falls upon the Director of Finance. D. Exhibit 16, p. 17; lines 7-11.

63.     Rosado never sent any invoices to García, the President of the MLC. D. Exhibit 16, pp. 17-18; lines 23-25 and 1-6.

64.     Rosado admits the President of the Legislature did not have an obligation to make arrangements to get Rosado invoices paid; he further recognizes that García did not have the authority to tell the Finance Department what to do. Exhibit 16, p. 18; lines 7-25.

65.     After multiple phone calls, the Department of Finance informed Rosado on several occasions that the Department was waiting for the order to pay him. D. Exhibit 16, pp. 22-23; lines 16-25 and 1-10.

66.     Rosado thinks García could have made arrangements to pay him after he became President of the MLC. D. Exhibit 16, p. 33; lines 15-22.

67.     Rosado thinks the commitments of the prior administration should have been cleared up by the exiting administration of former NPP affiliated president Roig, who headed the MLC while it was under the absolute control of the NPP. D. Exhibit 16, pp. 33-34; lines 23-25 and 1-2.

68.  Rosado did not send former President Roig (also known as Moncho to Rosado) or to García any letters claiming payments, although he did complain verbally to García.  D. Exhibit 16, p. 34; lines 3-5; p. 19, l. 25, p. 20, l. 1-6 .

69.  Rosado admits he billed some of his invoices up to twenty months late, all in a lump sum.  D. Exhibit 16, pp. 36-41.

70.  Defendants acknowledge that Plaintiffs Osorio-Velázquez, Rosado and Castrodad are owed monies for services rendered to the Municipality.  P. Exhibit K, page 6, lines 10-25; page 7, line 1; P. Exhibit D, page 37, lines 11-17); P. Exhibit J, page 20, lines 13-23.

71.  Plaintiffs are affiliated to and are members of the NPP.  P. Exhibit B, page 20, lines 11-15; P. Exhibit C, page 17, line 25; page 18, lines 1-25; page 19, lines 1-3; P. Exhibit E, page 11, lines 16-25; P. Exhibit F, page 11, lines 5-18; P. Exhibit H, page 10, lines 19-25; page 11, lines 1-25; page 12, line 1; P. Exhibit I, page 12, lines 12-25.

72.  Defendant Rosario[3]  has been the Mayor of the Municipality of Cataño since January 2009. He is a member of the PDP.  P. Exhibit D, page 9, lines 9-11.

73.  Defendant García  has been the President of the MLC since January 2013. He is a member of the PDP. D. Exhibit J, page 9, lines 21-25; page 10, lines 1-17.

74.  Defendant Rosario knew the political affiliation of Plaintiff Osorio-Castro. D. Exhibit 8, p. 26, l. 7-25.

---

[3] Plaintiffs mistakenly identified the Mayor in this particular fact as "**Osorio**-Meléndez".

75. Plaintiff Osorio-Castro stated that, the decision whether her contract was renewed or not, was based on the evaluations conducted at the end of the term of the contract. P. Exhibit H, page 16, lines 7-12. Her appointment was renewed for eight (8) years. D. Exhibit H, page 15, lines 7-14.

76. Osorio-Castro's appointment was not renewed by Mayor Rosario after December 31, 2012. Mayor Rosario stated that, the decision was made so that the Municipality's direct services would not be affected. P. Exhibit D, page 32, lines 3-24.

77. Mayor Rosario admitted he did not know what Osorio-Castro's specific responsibilities were at the center.  P. Exhibit D, page 27, lines 1-4.

78. Plaintiffs Guzmán, Ortega and Rivera were terminated from employment at the MLC by President García in January 2013.  They did not receive termination letters. They were told by President García that he could no longer keep them as employees because Mayor Rosario wanted PDP sympathizers, and not NPP sympathizers, at their positions.  P. Exhibit B, page 23, lines 16-25; page 24, line 1; page 28, lines 14-25; page 29, lines 1-12; P. Exhibit C, page 37, lines 4-25; page 38, lines 1-3; page 45, lines 18-25; page 46, lines 1-5; P. Exhibit F, page 26, lines 2-15; page 33, lines 16-25; page 34, lines 1-4.

79. Plaintiffs Rosado and Castrodad have inquired to Mayor Rosario as to the reasons for not having been paid. P. Exhibit D, page 37, lines 11-17.

80.    Plaintiffs Osorio-Velázquez, Rosado and Castrodad have also inquired to President García as to the reasons for not having been paid.  P. Exhibit E, page 14, lines 17-23; P. Exhibit I, line 25; page 20, lines 1-4; D. Exhibit J, page 20, lines 13-23; page 21, lines 1-7.

81.    Plaintiff Osorio-Velázquez was told by President García and the rest of the PDP municipal legislators that the reason she had not been paid was that she was affiliated to the NPP. P. Exhibit E, page 14, lines 17-23.

82.    President García did nothing regarding Plaintiffs' claims, among others, because he believed the matter had to be resolved by the previous President of the Municipal Legislature, the one "who was with them." P. Exhibit J, page 20, lines 24-25; page 21, lines 1-25; page 22, line 1.

83.    Plaintiffs Osorio-Velázquez, Rosado and Castrodad have made inquiries to the Municipality's Department of Finance as to the reasons for not having paid them for their services. P. Exhibit E, page 14, lines 17-23; P. Exhibit I, page 22, lines 16-25; page 23, lines 1-2.

84.    At some point in 2014, the Municipality attempted to contact Plaintiffs Osorio-Velázquez and Rosado in order to have them pick up a payment, but was unsuccessful in contacting them.  D. Exhibit 3 to Docket No. 83.

### LEGAL ANALYSIS

The Court addresses each of Defendants' claims in turn, divided by the individual group of Plaintiffs, to wit, Contract Plaintiffs, Trust/Career Plaintiffs and Plaintiff Osorio-Castro.

### A.   Contract Plaintiffs.

It has been clearly established that the First Amendment's protection of the freedom of association prohibits government officials from taking adverse employment action due to that person's political affiliation.   See, *e.g.*, Welch v. Ciampa, 542 F.3d 927, 938 (1st Cir. 2008);   see also, Rodríguez Marín v. Rivera González, 438 F.3d 72, 75 (1st Cir. 2006) (collecting cases).   Specifically regarding contract employees, it has also been established that protection against political affiliation discrimination applies outside the government employment context to someone who is neither a government employee nor seeks a continuing relationship with the government, but who merely asks to be paid in accordance with a contract which that person has already performed.   This was so held by the First Circuit in the case of Ramírez v. Arlequín, 447, F.3d 19 (1st Cir. 2006), where former municipal government contact employees had been refused payment by the incoming municipal administration which, like in the case at bar, held a different political affiliation than the former employees.

When evaluating a political discrimination claim, the Court uses the tripartite burden shifting test established by the Supreme Court in Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977); see also, Cruz-Báez, et. al. v. Negrón-Irizarry, et. al., 360 F.Supp.2d 326, 339 (D. P.R. 2005).

First, a *prima facie* case of political discrimination based on the First Amendment must establish four (4) elements: "(1) that the plaintiff and defendant have opposing political affiliations; (2) that the defendant is aware of the plaintiff's affiliation; (3) that an adverse employment action occurred; and (4) that political affiliation was a substantial or

motivating factor for the adverse employment action." <u>Lamboy-Ortíz v. Ortíz-Vélez</u>, 630 F.3d 228, 239 (1st Cir. 2010); <u>Martínez Vélez v. Rey Hernández</u>, 506 F.3d 32, 39 (1st Cir. 2007).   Once a plaintiff clears this hurdle, a defendant may then rebut that showing with what is commonly referred to as the <u>Mt. Healthy</u> defense.   They must prove, by a preponderance of the evidence, that "the governmental agency would have taken the same action against the employee even in the absence of the protected conduct." <u>Díaz-Bigio v. Santini</u>, 652 F.3d 45, 52 (1st Cir. 2011) (*quoting* <u>Guilloty Perez v. Pierluisi</u>, 339 F.3d 43, 51 (1st Cir. 2003) and <u>Mt. Healthy</u>)).

    As an initial matter, it is important to note that "circumstantial evidence alone can support a finding of political discrimination." <u>Anthony v. Sundlun</u>, 952 F.2d 603, 605 (1st Cir. 1991). "[A] plaintiff is not required to produce 'smoking gun' evidence of an employer's impermissible motive to defeat a motion for summary judgment." <u>Welch</u>, 542 F.3d at 940; <u>Padilla-García v. Rodríguez</u>, 212 F.3d 69, 73 (1st Cir. 2000) (emphasizing that the protected conduct need only be a factor in the employment decision, not the motivating factor).   This showing, however, requires more than merely "juxtaposing a protected characteristic-someone else's politics-with the fact that Plaintiff was treated unfairly." <u>Padilla-García</u>, 212 F.3d at 74.

    The Court must mention at this juncture that Defendants' reply has alluded to a case the undersigned recently decided, <u>Rodríguez Ramos v. P.R. Department of Education</u>, 2014 WL 7046261 (D. P.R. Dec. 12, 2014), a political discrimination case where the Court refused to consider Plaintiffs' self serving deposition testimony presented in opposition to Defendants' petition for summary dismissal of the claims. The Court's decision in that case,

however, was very fact specific to that case, for the peculiar procedural circumstances that governed it.

In Rodríguez Ramos, Plaintiffs failed to transcribe the deposition testimony of several key witnesses, including the Defendants.  As a sanction, the Court precluded them from using those depositions in the case.  As a result, the only evidence left to controvert Defendants' factual statements was Plaintiffs' own testimony.  That is not the case here, where all Defendants have provided deposition testimony which was used in the motions, and further, where some of that same testimony has served to raise a genuine issues of fact regarding certain issues.  In the event that no other evidence was supplied to sustain a fact here, however, the Court likewise did not accept Plaintiffs' self-serving testimony.

The Court notes from the outset that Defendants barely touched upon the crucial *prima facie* analysis in this case.  Indeed, while all three (3) of the Defendants' motions spell out the law, they proffer almost no analysis regarding the four (4) elements of the *prima facie* issue, opting instead to argue around their Mt. Healthy defense and the "but for" causation issue for all Plaintiffs.  It has been a maxim of this Circuit that "[i]t is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones. "'Judges are not expected to be mind readers.  Consequently, a litigant has an obligation 'to spell out its arguments squarely and distinctly,' or else forever hold its peace.' " United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (*quoting* Paterson–Leitch Co. v. Massachusetts Municipal Wholesale Elec. Co., 840 F.2d 985, 990 (1st Cir. 1988)).

Therefore, for purposes of this motion, the Court deems this argument waived and will assume that Plaintiffs have presented a *prima facie* case of political discrimination.

As has been clearly held, summary judgment is only warranted if "defendants evidentiary proffer compelled the finding that political discrimination did not constitute a 'but for' cause for the demotion." Acosta-Orozco v. Rodríguez-de-Rivera, 132 F.3d 97, 103 (1st Cir.1997) (*citing* Jirau-Bernal v. Agrait, 37 F.3d 1, 4 (1st Cir. 1994)). The defendant must show that the allegedly *bona fide* reasons for the adverse employment actions were sufficient by themselves to justify the negative decision. Acosta-Orozco, 132 F.3d at 103.

As part of their Mt. Healthy argument, Defendants offer what they argue is a legitimate, non-discriminatory reason for the lack of payment to these three (3) Plaintiffs, namely, that the Municipality's economic landscape is grim, and they lack the monies to pay the amounts owed. Osorio-Velázquez is owed $142,000.00 for legal services rendered from 2009-2012, and Plaintiffs Rosado and Castrodad are owed $31,200.00 and $35,750.00, respectively, for photography services rendered to the Municipality at different activities. Rosado rendered services from 2011-2012 and Castrodad from 2009-2010.

In support of their tardiness in payment, Defendants submitted a listing of names to whom payment is owed by the Municipality, to stand for the proposition that those listed are "notorious individuals" who hold the same political affiliation as Defendants and are also owed money and this somehow excuses them from complying with their obligation to pay for services rendered at the latest, three (3) years ago, and at the earliest, six (6). Unfortunately for Defendants, with this dearth of evidence, they have not put the Court in a position to rule in their favor.

In the Mayor's deposition, he testified about a list he ordered prepared with all the debts incurred in order, so that all suppliers could be paid, "without exceptions".[4] The list provided to the Court however, only supplied some names, and the Court has no way of knowing who they are, what party they belong to, how much they are owed, and the order in which each debt accrued. Even worse, the list states that they are "examples" of suppliers and people who have not been paid; in other words, it would seem that it is not the official list. The Court notes that Plaintiff Osorio-Velázquez and Rosado's names appear at the end of the list, even though Osorio-Velázquez' debt dates back to 2009, and Rosado's to 2011; in the actual listing, Osorio-Velázquez is listed 24 out of 35 and Rosado 34 out of 35. One Plaintiff (Castrodad) is not even on the list and he alleges he has not been paid.

Furthermore, the fact that the Mayor ordered a list prepared so that all debts be paid "without exceptions" goes against Defendants' allegations that the Finance Director is the "only person who can determine whether the contractor will be paid". See Docket 53-12 at ¶ 9. If there are to be no exceptions to the list, then it is the list and not the Finance Director that determines who shall be paid, and when. No explanation has been rendered by Defendants to explain these discrepancies. These two (2) issues give the Court pause in its determination of whether this was indeed a legitimate, non-discriminatory reason justifying the non-payment to these three (3) Plaintiffs.

Defendants have also justified their lack of payment to Plaintiffs by stating that other statutory debts must be taken care of before Plaintiffs are paid. The Court takes judicial

---

[4] The Court did not consider the Mayor's Unsworn Declaration, as it was not signed.

notice that under Puerto Rico law, debts must be included in a specific order of priority in each year's budget, to be paid in that order. The applicable law reads as follows:

> In the general budget draft resolution of each municipality, it shall be mandatory to include appropriations with sufficient credits for the following purposes, and in the order of priority provided below:
>
> (a) Interest, amortizations and withdrawal from the municipal public debt;
>
> (b) other statutory expenditures and obligations;
>
> (c) payment of court judgments;
>
> (d) any amounts needed to cover any deficits of the previous fiscal year;
>
> (e) expenses to which the municipality is legally obligated by contracts that have already been executed; P. R. Laws Ann. tit. 21, § 4303.

Defendants aver they must effect these payments before paying the contract debts, such as the ones in the present case, and this has impeded their ability to pay Plaintiffs. Defendants have supplied nothing to the Court, however, to evidence the Municipality has in fact, complied with any of these payments in the statutory order to buttress their Mt. Healthy defense as to why there have been impediments to tender payment to Plaintiffs.

This, coupled with Plaintiffs' testimony that they were told by the Mayor and others they were not going to be paid because they were NPP followers, serves to create a genuine issue of fact regarding the reason for the lack of payment to the Plaintiffs, which is proper only for a jury to determine. It will be up to the jury to analyze the facts before it and determine whether or not Defendants' actions were politically motivated.

As such, Defendants' motions regarding the contract Plaintiffs' claims are therefore DENIED.

### B.    Trust/Career Plaintiffs.

Regarding Trust/Career Plaintiffs Guzmán, Ortega and Rivera [5], Defendants aver they were trust employees, and as such, they cannot be said to hold a property interest over their employment.  In fact, these three (3) Plaintiffs' job descriptions explicitly classify them as trust employees.   Plaintiffs on the other hand posit their trust positions somehow changed, insofar at their duties were menial and administrative, did not entail policy-making and/or confidential functions that would require their allegiance to the current political administration.   Therefore, the fact that their title is "trust" employee is a non-issue, since their functions are those of career employees.

In evaluating a procedural due process claim under the Fourteenth Amendment, the Court's role is to determine "whether [the plaintiff] was deprived of a protected interest, and, if so, what process was his due." Logan v. Zimmerman Brush Co., 455 U.S. 422, 428, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982). The plaintiff " 'must identify a protected liberty or property interest and allege that the defendants, acting under color of state law, deprived [him] of that interest without constitutionally adequate process.' " González-Droz v. González-Colón, 660 F.3d 1, 13 (1st Cir. 2011) ; and Aponte-Torres v. Univ. of P.R., 445 F.3d 50, 56 (1st Cir. 2006)). Without this, the due process claim must fail. See Redondo–Borges v. U.S. Dep't of Hous. & Urban Dev., 421 F.3d 1, 11 (1st Cir. 2005) ("Because the plaintiffs identify no constitutionally protected property interest, it is unnecessary to delve any

---

[5] Co-Plaintiff Osorio-Castro's claims will be handled separately.

deeper into the section 1983 inquiry."). Such property rights are not created by the Constitution, but by "existing rules or understandings that stem from an independent source such as state law." Cleveland Board of Education v. Loudermill, 470 U.S. 532, 538 (1985).

Under Puerto Rico municipal public service law, there are several types of employees.

> The municipal public service shall be composed of career services, transitory services, confidential services and irregular services.
>
> (a) Confidential service.— The confidential service shall be constituted by positions whose incumbents intervene or collaborate substantially in the process of formulating public policy by providing direct counseling or rendering direct services to the mayor or the President of the Legislature.
>
> The municipal officials shall be the Secretary of the Legislature, the directors of the administrative units, and those whose appointments require the confirmation of the Legislature by legal provision, and that meet the criteria for confidential service. The employees of the Municipal Legislature shall be comprised in the confidential service by their direct relationship with the President thereof.....
>
> b) Career service.— All other municipal positions shall be comprised in the career service, with the exception of transitory and irregular positions.
> The career service shall be governed by the merit principle standards established in this subtitle.
>
> P.R. Laws Ann., tit. 21, §4553.

It has been well established that under Puerto Rico law, only career employees have property rights in their continued employment, and the employer must have just cause for

their removal.  Soto-González v. Rey-Hernández, 310 F.Supp.2d 418, 425 (D. P.R. 2004)

(citing Kauffman v. P.R. Tel. Co., 841 F.2d 1169, 1173 (1st Cir. 1988)).

In 1980, the Supreme Court decided the landmark case of Branti v. Finkel, 445 U.S.

507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), where the Court departed from the

policymaking and confidential labels previously espoused in Elrod v. Burns, 427 U.S. 347,

96 S.Ct. 2673 (1976).  The Court first recognized that some labels were under inclusive,

because "a position may be appropriately considered political[6] even though it is neither

confidential nor policymaking in character." Branti at 518, 100 S.Ct. at 1294.  It further

found that other labels were over inclusive, because party affiliation is not a relevant

consideration for all policymaking or confidential positions. Id. The Court distinguished

between policymaking positions related to "partisan political interests [or concerns]," Id.

at 519, 100 S.Ct. at 1295, which would be vulnerable to discharge, and positions having no

bearing on such concerns, which would be protected by the First Amendment.  As an

example of the latter, the Court discussed the position of a state university football coach,

which is policymaking, but for which it cannot seriously be argued that "[Republicans make

better coaches than Democrats ... no matter which party" controls state government. Id. at

518, 100 S.Ct. at 1294.

In keeping with this norm, the Court of Appeals for the First Circuit has held that the

designation of a position as "trust" or "career" under Puerto Rico law, although entitled to

some deference, is not, in and of itself, dispositive in determining the federal question of

---

[6]  The Court used this example when speaking about an election judge, where state election laws require that precincts be supervised by two judges of different parties. Id.

whether a position is afforded the upmost protection under the First Amendment. See Duriex-Gauthier v. López-Nieves, 274 F.3d 4, 8 (1st Cir.2001), Ruiz Casillas v. Camacho Morales, 2004 WL 3622480 (D.P.R. 2004).   The First Circuit "consider[s] the job description to be the best, and sometimes dispositive, source for determining the position's inherent functions." O'Connell v. Recio, 2012 WL 3561921 (D.P.R. 2012) (*quoting* Roldán Plumey v. Cerezo Súarez, 115 F.3d 58, 62 (1st Cir. 1997)); see also Ortiz-Piñero v. Rivera-Arroyo, 84 F.3d 7, 13-14 (1st Cir. 1996) (A plaintiff's job description  is the best source for determining whether a position is career or trust).

In this analysis, it is the "focus on the powers inherent in a given office, as opposed to the functions performed by a particular occupant of the office" what governs the Court's inquiry.  Jiménez Fuentes v. Torres Gaztambide, 707 F.3d 236, 242 (1st Cir. 1986); *accord* Cordero v. de Jesús Méndez, 867 F.2d 1, 9 (1st Cir. 1989); see also Méndez-Palou v. Rohena-Betancourt, 813 F.2d 1255, 1258 (1st Cir.1987) and  Méndez-Aponte v. Bonilla, 645 F.3d 60,66 (1st Cir. 2011) ("We focus only on the inherent duties of the position under review and do not consider the actual tasks performed by a present or past officeholder.").   In looking at the job description, the Court must also consider the position's "relative pay" and whether it entails "technical competence, power to control others, authority to speak in the name of policymakers, public perception, contact with elected officials and responsiveness to partisan politics and political leaders."  Méndez-Palou, 813 F.2d at 1259.

Therefore, the Court's first and only inquiry is geared towards the job description, while keeping in mind Plaintiffs and Defendants' accounts of what Plaintiffs did or should have done are quite irrelevant to the actual, official duties contained in each job description.

Plaintiff Ortega's job description for Sergeant at Arms states that he "performs work of moderate complexity and responsibility, which consists of maintaining the order and distribute notices, reports and documents to the participants of the Municipal Assembly. Receive general instructions in the common aspects of the positions and specific in new or special situations; Attends all the meetings of the Commissions of the Municipal Assembly when his presence is required".  (Docket No. 53-1).

As examples of the Sergeant of Arms' tasks, the document states that he "watches and maintains order in the meetings of the Municipal Assembly. Distributes the documents necessary to the participants of the meetings of the Municipal Assembly. Executes the orders of the President or his substitute. Is responsible for watching over the property of the Legislative Municipal Body. Installs the amplifier equipment and records in the conference room. Reproduces the transcripts of the recordings of the meetings in the Municipal Assembly using a photocopier. Inspects and maintains the vehicle he drives in good conditions and verifies it has no mechanical defects".  Id.

Requirements for the position, among others, are that he have "[k]nowledge in operating the equipment and amplifier and recording system. Skills in operating photocopiers, amplifying equipment and recording." Id.

Under the above mentioned guidelines established by the Court of Appeals for the First Circuit, the Court cannot find that this is a trust position. Indeed, a number of the functions of the position involve menial paperwork matters, and are mostly mechanical (e.g., distributes the documents necessary to the participants of the meetings of the Municipal Assembly, reproduces the transcripts of the recordings of the meetings in the

Municipal Assembly using a photocopier, installs equipment."). Thus, the Court cannot find that any of these require making any policy judgments or advising any official on policy matters.

Furthermore, part of Sergeant at Arms' job responsibilities require him to inspect and maintain the vehicle he drives. Surely Defendants do not mean to suggest that what seems to be an auto mechanic is a trust employee. Nor does the job seem to involve any special technical competence besides operating a photocopier and an amplifying system, which do not require any specific set of skills.

The Sergeant at Arms further does not operate as a spokesperson or a liaison with the public or other government agencies, he has no power to control others, he does not appear to have entailed discretionary judgments involving the implementation of policy, does not collaborate substantially in the process of formulating public policy and does not supervise any employees. It is hard to see how this position implicates significant policy issues, let alone "partisan political interests ... [or] concerns," that the Supreme Court spoke of in Branti, 445 U.S. at 519, 100 S.Ct. 1287. Nor does this position appear to be for one of those mid-or upper-level officials or employees who are "significantly connected to policy-making." Flynn v. City of Boston, 140 F.3d 42, 45 (1st Cir. 1988). Although the position has some direct contact with the President of the Assembly, ("executes the orders of the President or his substitute"), Defendants have failed to identify policy decisions in which Plaintiff Ortega was directly involved or over which he had influence. Plus, this responsibility seems to be more passing on the instructions as given to him, rather than influencing or making policy decisions.

Defendants further claim that, because the Sergeant at Arms was given confidential documents, that this somehow automatically makes him a trust employee. Besides the fact that Ortega testified that he never saw the contents of the sealed envelopes he was given to deliver, this would seem to be a further function of his job to execute the orders of the President that any actual policymaking.

Finally, the Court notes the position of Sergeant at Arms has a fairly clear and explicit set of duties and responsibilities. Thus, it cannot hold that this is the case of an "employee with responsibilities that are not well defined or are broad of scope", which have been held to more likely be functions of a policymaking position. Elrod, 427 U.S. at 368, 96 S.Ct. 2673.

The same reasoning applies to the remaining two (2) Plaintiffs who fall under this rubric. Plaintiff Rivera was classified as a "Confidential Assistant in Office Systems." Her job responsibilities include: "[t]ranscribes by typewriter or word processor different documents, recordings, ordinances and resolutions. Attends and orients visitors who visit the Municipal Assembly of Cataño. Makes calls, answers telephones, reports messages and orients or refers the same to the corresponding official. Transcribes records. Performs and makes telephone calls to Assembly Members, in relation to the Assembly's sessions, meetings or activities. Prepares the indexes of the Ordinances and Resolutions organized by years. Enters information in the computer. Drafts simple communications, declarations and other work matters". Docket No. 68-2.

Just like the Sergeant at Arms, the Court fails to see how this position could possibly be qualified as a trust position. There is nothing confidential about it. Once again,

Defendants have failed to identify policy decisions in which Plaintiff Rivera was directly involved or over which she had influence.  Plaintiff Rivera testified she had access to confidential information (which she denies having seen), yet this by itself, is insufficient to make her a trust employee.  Furthermore, Defendants have stated on the record that even though there were two other persons who had the same job title as Rivera, they did not perform the same functions as her.  This is so precisely because Rivera was performing functions that were outside her job description.  On "the spectrum between policymaker and clerk," Méndez-Palou, 813 F.2d at 1259, Rivera was closer to the latter and is, at least on the record before the Court, protected under Elrod.

The same is the case with Plaintiff Guzmán, the Accounting Clerk. Her job description states that she "performs work of moderate complexity and responsibility, which consists of performing assistant accounting tasks in the Municipal Assembly of Cataño. The employee would work under the supervision of the Municipal Secretary who provides specific instructions regarding the work to be done, which are generalized as he acquires experience. The employee does have certain initiative and say in carrying out his duties according to the established norms and procedures". Docket No. 53-5.

Among her tasks to be performed are: "Fill out and type purchase orders and payroll reports and send same to Finance Department appropriate endeavors. Keep accounting books and ascertain that the appropriate accounts are created and entries made in the appropriate ledgers. Transfer funds from one account to another to ensure their balances and that the same are covered. Verify, review different invoices, and send originals to Finance, and file copies thereof. File letters, receipts, vouchers and other documents. Verify

and follow up on orders and vouchers pending payment.  Attend to suppliers when they deliver merchandise and verify the quality thereof".  Id.

Defendants posit that Plaintiff Guzmán was the sole person in charge of the budget (even referring to her as the CFO), yet her job description, which pursuant to the aforementioned case law is the relevant focus, is that of a regular clerk.  While she was perhaps performing those functions as a result of Defendant's failure to hire a more senior person, that information is not before the Court.  The preparation for the position is that if a high school degree, with one year of experience in "automated accounting systems".  Docket No. 90-2.  Surely the government has a higher educational requirements for the position Chief Financial Officer.

In an attempt to defend that Plaintiff Guzmán occupies a trust position, Defendants have argued that this person responded to the "two highest" positions of the Municipal Legislature.  The job description, however, only mentions that she will be supervised by the Secretary, not the President.  Furthermore, the fact that she is supervised by the Secretary and not the President works against Defendants, as she is more removed from the President, and because, by default, at some point a career employee has to necessarily respond a trust employee.  The fact that she does not supervise, does not participate in or influence any policy decisions further evidences the Court's holding today, and weighs heavily against Defendants' arguments.  On the record as it stands, and for all the same reasons espoused before, the Court cannot hold that this position can be classified as a trust position.

Finally, the Court must mention that Defendants have made a cursory argument about the fact that at least some of these employees (co-Plaintiff Rivera, for one) obtained her position without competing for it, to apparently stand for the proposition that this somehow bolsters her trust employee status. See Docket No. 53, at 30. However, the Court of Appeals for the First Circuit has indicated that the "failure of a municipality to follow the law in hiring employees does not make such employees fair game for political discrimination by a subsequent administration" Santiago-Negrón v. Castro-Dávila, 865 F.2d 431 (1st Cir. 1989). Therefore, the fact that Defendants may have "mislabeled" or made illegal hirings for these positions does not excuse their actions if they were made with discriminatory intent.

The fact the Municipality has apparently mislabeled these three (3) positions is unfortunate for Defendants, as the descriptions of their functions cannot be said to be confidential under any stretch of the imagination.  Having so found, these three (3) Plaintiffs were entitled to due process before their removals.

In turn, Plaintiff Osorio-Castro (the Social Worker) presents a slightly different story.  Her official job description states that it is, in fact, a career position, yet Plaintiff and Defendants have both admitted that she was hired as a transitory employee, which according to black letter law, has no property interest in continued employment.[7]

Defendants, however, have not addressed this issue, and have opted instead to argue once again their Mt. Healthy defense, namely, that her contract was not renewed (and

---

[7] The Court notes this position was made a career position during the tenure of Mayor Edwin Rivera Sierra, who was Mayor of Cataño from 1987 until 2003.

consequently, that she was not replaced) for lack of funds.  Defendants additionally state the Mayor appointed her to another position temporarily while knowing she was an NPP member, thus proving non-discriminatory animus.  Naturally, they also posit that, since her position was a transitory one, she had no protected status.   The three (3) reasons given by Defendants however, all hinge on one thing, that is, the classification of her position, which is the genesis of this analysis.

Pursuant to the Court of Appeals of the First Circuit's directives, the Court turns to the job description.  Although Plaintiff Osorio-Castro has admitted that she was under contact, *Defendants' own official document* clearly shows the position to be a career one, upon which all the rights of career service are bestowed on, including just cause for removal.  Defendants have further admitted to having hired her as a transitory employee, in clear contravention of their own job description and Puerto Rico law.  Defendants have failed to explain this discrepancy to the Court.  Furthermore, a cursory reading of her job description contained at Docket No. 53-9 clearly shows that her duties were, in fact, those proper of a career position, and Defendants would be hard-pressed to argue otherwise.

The proffered non discriminatory reason for her dismissal - that the Mayor did not want the Municipality's services affected- rings hollow when the Court considers that  the Mayor stated that the decision to terminate Plaintiff  Osorio-Castro was because he did not want the Municipality's "direct services" to be affected, yet at the same time, he stated under oath that he did not know what her responsibilities were.

Because Defendants based their summary judgment motions for these Plaintiffs strictly on the nature of their positions, no argument was presented regarding politically

motivated animus for their actions.  The Court is therefore not in a position to rule on this issue, and therefore, summary disposition as to these claims is DENIED.

### C.    Individual Capacity Defendants.

Defendants have also argued that no claims have been raised against individual capacity Defendants Rosario and García, and that therefore, their claims must be dismissed. Regarding the contract employees, they aver that it was the Director of Finance who had the ultimate authority regarding who was paid.  As to the trust employees, they argue that their positions were appointed or trust positions, and thus they were entitled to their removal without just cause.

On the record as it stands, there is a genuine issue of fact over whether or not the Mayor did, in fact, have control over who was paid and when, as discussed in section A above.  On the scarce evidence before the Court, and making all reasonable inferences in favor of Plaintiffs, as the Court must at this stage, the list with "examples" of Municipal debts (which proves little), and the Mayor's testimony have created a genuine issue as to Defendants' motivation.  Furthermore, García's statements to Plaintiffs that he failed to take any action regarding their claims for payment, that the payment was the responsibility of the past president who was from their own party, and that the Mayor wanted PDP sympathizers in their positions, all serve to create an issue of fact as to possible motivation, which makes summary disposition of their claims improper at this stage.  Hence, summary judgment is DENIED as to the individual capacity Defendants.

### D.    Qualified Immunity.

Defendants have raised the qualified immunity defense as to the Career/Trust Plaintiffs, which as has been well established, protects public officers from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).  The qualified immunity defense recognizes an entitlement "not to stand trial or face the other burdens of litigation, conditioned on the resolution of the essentially legal question whether the conduct of which the plaintiff complains violated clearly established law." Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985).

In order to determine whether qualified immunity is appropriate, a court must identify: 1) whether the constitutional right asserted by the plaintiff was "clearly established" at the time of the alleged violation; and (2) whether an objectively reasonable official in the same circumstances would have understood that his or her conduct violated that right. Fletcher v. Town of Clinton, 196 F.3d 41, 48 (1st Cir.1999).

As applied to the case at bar, the qualified immunity defense depends on whether the nature of Plaintiffs' positions was such that Defendants were entitled to consider their political affiliation as a job qualification and, even if they were not, whether a reasonable officer at the time would have understood patronage dismissal to be barred. See Limone v. Condon, 372 F.3d 39, 44 (1st Cir.2004).  The Court has already established that because these four (4) Plaintiffs occupied career positions, however mislabeled they were,

Defendants were not entitled to consider their political affiliation as a job qualification. That right has been clearly established for some time under Elrod and Branti.

The crucial question then becomes whether a reasonable official acting at the time of their termination should have known on what side of the Elrod/Branti line Plaintiffs' positions fell. Méndez-Palou, 813 F.2d at 1259. Largely for prudential reasons, the test is not subjective but asks what a reasonable official would have thought. Pagán v. Calderón, 448 F.3d 16, 31 (1st Cir. 2006).

The Court finds that it should be fairly obvious that persons performing such menial tasks as copying, installing amplifiers  and inspecting vehicles (Sergeant at Arms); answering telephones, attending to visitors and preparing indexes (Assistant); and reviewing invoices, sending originals to the Finance Department, filing copies, receipts, and reports (Accounting Clerk)  cannot possibly be reasonably thought of as a trust employees. The fact that Defendants assigned other duties outside their official responsibilities to these three (3) Plaintiffs does not convert their positions into appointed ones. Regarding Plaintiff Osorio-Castro, her right as a career employee was plainly noticed on her job description. Thus, a reasonable official could not have deemed them subject to dismissal due to political patronage. As such, qualified immunity as to the Trust-Career Plaintiffs is therefore DENIED.

Mirsonia Osorio Velázquez, et al v. Municipality of Cataño, et al
Civil No. 13-1418 (CVR)
Opinion and Order
Page 41

## CONCLUSION

For the reasons stated above, the Court hereby DENIES Defendants' Motions for

Summary Judgment. (Docket Nos. 54, 55 and 56).

IT IS SO ORDERED.

In San Juan, Puerto Rico, on this 2nd day of March of 2015.

S/CAMILLE L. VELEZ-RIVE
CAMILLE L. VELEZ RIVE
UNITED STATES MAGISTRATE JUDGE